UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOANNA WILSON, as Independent Administrator of the Estate of AREON MARION, Deceased,<br><br>Plaintiff,<br><br>v.<br><br>COOK COUNTY, ILLINOIS, *et al.*,<br><br>Defendants. | No. 22 CV 6886<br><br>Magistrate Judge Young B. Kim<br><br>July 12, 2024 |

**MEMORANDUM OPINION and ORDER**

Plaintiff Joanna Wilson ("Joanna"), as Independent Administrator of the Estate of Areon Marion ("Areon"), filed this wrongful death action against Cook County, Illinois (the "County"), arising out of her son Areon's death while detained at the Cook County Jail ("CCJ"). Before the court is Joanna's Motion to Approve Settlement of Wrongful Death Action and to Approve Distribution of Funds totaling $883,397.22. For the following reasons, the court grants the motion to the extent that the Estate is ordered to distribute $2,000 to Joanna for the benefit of Areon's younger brother, Dominic ("Dominic") Wilson, who is a minor, $2,500 to Areon's older brother Robert Marion ("Robert"), $87,889.72 to Areon's father, Adair Joyner ("Joyner"), and $791,007.50 to Joanna:

**Background**

According to Joanna's December 2022 lawsuit, Areon was only 22 years old when he died by suicide on October 31, 2021, while detained at the CCJ. (R. 18, Pl.'s

First Am. Compl. ¶ 1.) The Chicago police arrested Areon on June 1, 2021, and he was later assigned to a psychiatric special care unit at the CCJ to address symptoms of psychosis. (Id. ¶¶ 19-21.) During his months-long detention, Areon moved between the psychiatric special care unit and one of the maximum-security divisions at the CCJ, where he repeatedly expressed suicidal ideation. (Id. ¶¶ 35, 37, 39-42, 44, 46-47.) While the psychiatric special care unit had 24-hour mental health care and suicide resistant cells, the maximum-security division, where Areon was held from to time, did not. (Id. ¶ 36.) On October 29, 2021, two days before his death, Areon returned to the maximum-security division from the special care unit. (Id. ¶¶ 46-47.) A correctional officer assigned to the division was supposed to conduct safety checks every half-hour, but on the day of Areon's death, the assigned officer "left his post unattended without requesting backup" and during his absence Areon hanged himself. (Id. ¶¶ 51-53.)

On November 16, 2023, the court held a settlement conference in this case and the Estate and the County resolved the case. (R. 57; R. 60, Pl.'s Mot. ¶ 3.) Then on December 13, 2023, Joanna filed the instant motion for court permission to distribute the settlement funds. (R. 60.) The court granted the motion to the extent that the court found the total settlement amount of $1,500,000 and the total fees and costs in the amount of $616,602.78 to be fair and reasonable. (R. 66.) However, the court continued the motion to the extent Joanna sought to distribute the remaining settlement funds in the amount of $883,397.22 (the "Funds"). (Id.)

2

In the motion Joanna requests that $2,000 of the Funds be distributed to Dominic, $2,500 to Robert, and the remaining $878,897.22 to herself. (R. 60, Pl.'s Mot. ¶ 12.) The motion does not seek to distribute any of the Funds to Areon's other siblings or to his father, Joyner. (Id.) Although Areon's other siblings agreed to the proposed distribution, the motion does not indicate whether Joyner consented to it. As such, the court entered an order on February 5, 2024, inviting Joyner to submit his position on the motion. (R. 70.) Joyner did so on February 16, 2024, indicating that he did not oppose the proposed distribution of Funds to Dominic or Robert, but argued that he is entitled to a third of the Funds, or $294,465.74. (R. 71, Ltr.) Because of this dispute between Joanna and Joyner on the distribution of the Funds, the court held a dependency hearing on June 11, 2024. (R. 79.) Neither Joanna nor Joyner was represented by an attorney at the hearing.

Both Joanna and Joyner testified during the hearing and several of their family members testified in support of their respective claims of loss and dependency. Joanna testified on her own behalf and presented the testimony of Robert, Areon's other younger brother, Ryan Marion ("Ryan"), Areon's older sister, Amber Marion ("Amber"), Areon's uncle and Joanna's brother, Bruce Marion ("Bruce"), Areon's step-father and Joanna's husband, William Wilson ("William"), and Areon's cousin, Kimberly Cooper. Joyner testified on his own behalf and presented the testimony of Areon's cousin, Sabrina Joyner-Hardrick, Joyner's wife, Sharon Joyner ("Sharon"), Areon's aunt, Maria Joyner, Joyner's niece-in-law Venessa Hardrick ("Venessa"), and Joyner's sister-in-law, Takesha Johnson.

3

## Legal Standard

The Illinois Wrongful Death Act provides that any amount recovered shall be "distributed by the court in which the cause is heard" and the amount will pass to the "next of kin of such deceased person in the proportion, as determined by the court, that the percentage of dependency of each such person upon the deceased person bears to the sum of the percentages of dependency of all such persons upon the deceased person." 740 ILCS 180/2(b). To determine one's next of kin, the Illinois Wrongful Death Act follows the Illinois system of intestate distribution. *Hudson v. Kelly*, No. 98 CV 7847, 1999 WL 412705, at *4 (N.D. Ill. June 3, 1999); *Reiser v. United States*, 786 F. Supp. 1334, 1335 (N.D. Ill. 1992). Areon was unmarried and had no children at the time of his death, making his parents and siblings his "next of kin." *See Reiser*, 786 F. Supp. at 1335. There is no dispute over Areon's next of kin in this case. (See R. 60, Pl.'s Mot. ¶ 10 (listing Areon's next of kin).) At the time of his death, Areon left surviving as his next of kin: (1) his mother, Joanna; (2) his father, Joyner; (3) his brothers, Robert, Ryan, Dominic, and Aiden Joyner; and (4) his sister, Amber. (Id.)

To decide the proper distribution of the Funds, the court has the "responsibility of determining the relative dependency of the parties" and the proportionate percentages. *Williams v. Rush-Presbyterian St. Luke's Med. Ctr.*, 899 N.E.2d 1241, 1246 (Ill. App. Ct. 2008). "Dependency" implies a present existing relationship between two persons. *Winters v. Cook Cnty.*, No. 08 CV 7276, 2011 WL 2142853, at *2 (N.D. Ill. May 24, 2011). But "dependency" is not defined by statute and "there is

4

no mathematical calculation or formula for determining the division of an award." *Johnson v. Provena St. Therese Med. Ctr.*, 778 N.E.2d 298, 307 (Ill. App. Ct. 2002). Dependency is not limited to financial dependency, but also includes "loss of society," which is "comprised of mutual benefits that each family member receives from the other's continued existence, including loss of affection, care, attention, companionship, comfort, guidance, and protection." *Burke v. J.B. Hunt Transp., Inc.*, No. 91 CV 3459, 1992 WL 137153, at *3 (N.D. Ill. June 10, 1992). As such, the damages, or in this case, the Funds, are "intended to provide the . . . benefits that would have been received from the continued life of the decedent." *Id.* (citation omitted).

## Analysis

At the outset, the court notes that in ruling on the amount of the Funds to be distributed to Joanna and Joyner in this case, the court is not quantifying the loss Areon's parents are experiencing. Losing a child is a devastatingly painful experience, and the loss is extremely difficult, if not impossible, to quantify. Moreover, the dependency hearing in this case demonstrate that Areon's death continues to affect a great number of individuals. That said, the court has an obligation to rule on the very narrow issue of the percentage of Funds to be distributed to Joanna and Joyner. To do so, the court must ultimately compare the losses Joanna and Joyner each suffer from Areon's death without disrupting the proposed distribution of the Funds to Dominic and Robert.

The quality of both Joanna's and Joyner's evidence presented at the dependency hearing suffered by the fact that neither was represented by an attorney. Notably, the testimony of Joanna and Joyner and each of their witnesses was general and conclusory in nature. That said, a definite theme emerged from each side's presentation. While Joanna's presentation focused on her close bond and involved relationship with Areon and the loss she suffered because of his death, Joyner's centered on frustration over the fact that the issue had to be litigated in court and Areon's alleged complaints regarding Williams's treatment of him during his childhood. Of course, such complaints are not germane to the issue of the loss each parent has suffered because of Areon's death.

The hearing testimony reflects that Joanna was the parent who primarily raised and financially and emotionally supported Areon for much of his life. Areon was born in the Chicago area in December 1998 and moved to Arizona in July 2007 with his mother and siblings Amber, Robert, and Ryan. Joanna and Joyner were never married. Areon and his family grew up mostly in Arizona but occasionally returned to the Chicago area during his childhood. Shortly after moving to Arizona, Joanna met and married William, who moved in with her and her children.

Areon lived with Joanna and William until after he graduated high school in the summer of 2017. Areon had a passion for entrepreneurship, fashion, music, traveling, and performing. In or around 2019, Areon relocated to Chicago, moving in with his uncle Bruce. Areon returned to Arizona as an adult, staying with Joanna

6

and William for months at a time in 2020. The evidence shows that Areon never lived with Joyner while in the Chicago area as an adult.

It is clear from Joanna's testimony that Areon was very close to her and she to him. The court was also struck by Joanna's genuine look of despair and emptiness as she remained silent from time to time during the hearing, struggling with difficult emotions. Ryan testified that Joanna was "Number 1 in [their] life" and "everywhere [Areon] went, anywhere he went, it was always her he called and she called him." (R. 80, Hr'g Tr. 27:8, 10-11.) Areon's older sister, Amber, reinforced Areon's close relationship with his mother, noting that she "was all he had [and] was his go-to when he was going through all of his changes in life, all of his achievements, my mom did it all." (Id. at 36:19-21.) Amber also spoke to their mother's parenting and ability to care for her and her siblings: "[T]he truth is that my mom did everything by herself. So if anyone else is claiming to be entitled to anything, my mom is the only person that is entitled to anything and everything because she did everything. She put in the work. She took care of us." (Id. at 37:16-20.) Amber continued, "this is more than just a loss. It is more than that. She is forever affected. This has forever changed her" and "even after death you can't break [Areon and his mom] apart." (Id. at 37: 6-7, 40:7-8.) Joanna, who was living in Arizona, spoke with Areon almost daily and when Areon was detained at the CCJ, sent gifts and money to him so that they could remain in contact. (Id. at 21:16-25.) Bruce echoed Amber's testimony and described Joanna crying about her son's death and talking about him all the time. (Id. at 42:2-

7

13.) Bruce also had difficulty at the hearing getting his testimony out, showing deep emotion when talking about his sister and nephew.

In comparison, Areon's relationship with his father Joyner was a strained and distanced one. While Areon had personal contacts with Joyner and his cousins during his return visits to Chicago from Arizona and Areon and Joyner occasionally spoke on the phone, Joyner remained in the Chicago area when Areon and Joanna moved to Arizona, and never visited his son in Arizona, not even when he graduated from high school. (Id. at 76:5-8.) Joyner says no one ever invited him to visit Areon in Arizona, (id. at 60:12-14, 61:17-18, 72:6-7), but he also did not explain what, if anything, prevented him from visiting his son.

Ryan testified that his family visited Joyner when they returned to Chicago but that the relationship between Areon and Joyner was attenuated, explaining that Joyner "never called," and when they were able to talk to Joyner, "I would have to beg him to say hello on the phone when he talked to my brother." (Id. at 31:1-6.) Similarly, Amber testified that Areon and Joyner's relationship was strained—Areon would not call his father because Joyner either did not answer the phone or had an excuse whenever Areon asked for something, leading Areon to eventually stop asking. (Id. at 39:5-13.) For his part, Joyner testified that he had no say in Areon moving to Arizona and that he would send financial help to his sons from Illinois when asked. (Id. at 60:12-17, 76:17-22.) Joyner and his wife Sharon saw Areon on occasion, such as getting together for a meal or to pick Areon up at the airport when he came back to the area. And although Joyner says he offered to have Areon live with him, Joyner

claimed that Areon declined and lived with his uncle instead, citing an easier commute as the reason. (Id. at 78:10-18.) Joyner found out about Areon's arrest and detention at the CCJ from a phone call with Ryan, (id. at 79:5-9), but Joyner testified that he never visited Areon or tried to speak with him while Areon was detained at the CCJ. (Id. at 79:10-16.) From the evidence presented, the court infers that, unless Areon made the effort, Joyner did not go out of his way to see or spend time with him.

While Joyner testified that, during the time he and Joanna were still together in Chicago and prior to Joanna and Areon's move to Arizona, he "did what a man and a father was supposed to do," and worked, cooked, cleaned, and helped repair a building Joanna owned, (id. at 59:21-24, 60:4-5), this evidence does not negate Joyner and Areon's relationship growing apart throughout the latter part of Areon's life. Indeed, the purpose of the Illinois Wrongful Death Act is to compensate for the benefits "that would have been received from the continued life of the decedent," and, from the evidence presented, Joyner has not established that he would have had regular meaningful relationship with Areon, like the one Joanna had with him, moving forward if Areon had not died. *See Burke*, 1992 WL 137153, at *3. That said, there was testimony describing Joyner's sense of loss from Areon's death. In particular, Joyner's niece-in-law, Venessa, testified that Joyner was "overwhelmed with hurting pain" at Areon's funeral over his son's death. (R. 80, Hr'g Tr. 94:15-18.)

Based on the testimony presented, the court finds that the level of Joanna's loss of Areon's companionship is at least 10 times greater than Joyner's and, therefore, orders that, after subtracting Dominic and Robert's portions, Joyner is

9

entitled to receive no greater than 1/10 of the Funds while Joanna is to receive the remainder. This apportionment takes into account the time both parents spent with Areon and the companionship taken away from each parent because of Areon's death. *Johnson*, 778 N.E.2d at 307-08. But this apportionment rejects the motion's premise that Joyner is not entitled to any share of the Funds. (R. 60, Pl.'s Mot. ¶ 10.) While Joyner suffers less loss of companionship from Areon's death when compared to Joanna's loss, a bond remained between Areon and Joyner. Joyner therefore suffers some compensable loss because of Areon's death. *See Adams v. Turner*, 555 N.E.2d 1040, 1044 (Ill. App. Ct. 1990) (father and daughters' ongoing reconciliation emerging from parents' divorce demonstrated some loss upon father's death).

Areon's relationship with his mother, Joanna, was plainly deep and meaningful and Areon spent time with his mother on a more regular basis than with his father. *See In re Est. of Williams*, 585 N.E.2d 235, 237 (Ill. App. Ct. 1992) ("[T]ime actually spent with the child is relevant."). That is not to say that Areon did not have a relationship with his father—he did; it was just a relationship with significantly less contact. Areon lived with his mother for much of his life, in both Arizona and in Illinois. Areon spoke with his mother on an almost-daily basis compared to sporadic contact with his father. Areon could reasonably be expected to treat his mother's house in Arizona as his homebase and return with greater frequency compared to visits with his father, with whom Areon had not lived since he was a very young child. *See id.* (majority of damages went to parent who was "the one that shared the subtle and meaningful experiences of the developing child's life on a constant basis."). This

10

court recognizes that "[g]rief, sorrow and mental suffering are highly subjective experiences which are difficult to quantify," *Karahodzic v. JBS Carriers, Inc.*, 881 F.3d 1009, 1023 (7th Cir. 2018), and Areon's death caused loss to both parents, and to Areon's siblings, other relatives, and friends.

As the court stated previously, the issue before the court is a limited one—that is, determining the percentages of the Funds that should be distributed to Joanna and Joyner. The ruling in this case should not be interpreted to mean that Joanna's loss or Joyner's loss totals the amount they are receiving from the distribution, but simply that the court appreciates that Joanna's loss is much greater when compared to Joyner's. Again, the court recognizes that Joyner remained in Areon's life, maintained a bond with him, and suffers loss from his death. And Joyner may be correct that his relationship with Areon may have been very different if the family had not moved away to Arizona, but the court's inquiry is limited to what occurred and not what might have been under hypothetical circumstances. The court extends its deepest condolences to Areon's family for their profound loss.

## Conclusion

For the foregoing reasons, the court grants the motion to the extent that the Estate is ordered to distribute $2,000 to Joanna for the benefit of Dominic, $2,500 to Robert, $87,889.72 to Joyner, and $791,007.50 to Joanna.

**ENTER:**

**Young B. Kim
United States Magistrate**